UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | CAUSE NUMBER 3:07-CR-80(01)RM |
| ) | |
| DONALD SAGER ) | |

OPINION AND ORDER

This cause came before the court on November 8 and December 27, 2007 for hearing on defendant Donald Sager's motion to suppress evidence. Law enforcement agents inspected a personal computer that Mr. Sager used on the strength of consent given by Mr. Sager's sister. Mr. Sager contends that his sister's consent was invalid because he had a reasonable expectation of privacy in the area of the home in which the computer was found and because her consent was not given voluntarily. For the reasons that follow, the court denies Mr. Sager's motion.

I. FACTS

Shortly before 9:00 a.m. on July 10, 2007, Mitch Kajzer, Commander of the St. Joseph County Prosecutor's Office High Tech Crimes Unit and three St. Joseph County police officers appeared at the residence at 22830 Adams Road. David and Carol Daron lived there, but it was Mrs. Daron's brother, Donald Sager, that triggered the visit. The trip to Adams Road was part of an investigation set in motion by two complaints Commander Kajzer had received from the national center for missing and exploited children regarding comments posted on America

Online chat rooms by a specific screen name, indicating a sexual interest in children.

By using the screen name, Commander Kajzer learned from the America Online profile that the person enjoyed swimming at the Elkhart YMCA, and he obtained a photograph from the screen name's MySpace profile. Commander Kajzer went to the Elkhart YMCA on July 6, where the chief operations officer identified the person in the photo as Donald Sager. Commander Kajzer found a listing for Mr. Sager in the Indiana Sex Offender Registry, showing the Adams Road address as his residence, but also found a Goshen address for Mr. Sager. Uncertain which address was correct, Commander Kajzer decided to do a "knock and talk" at the Adams Road address to see if Mr. Sager lived there, speak with him if he was there, and, depending on how the conversation went, to do a "preview" on (a look at the hard drive of) his computer.

Fellow High Tech Crimes Unit Corporal Philip Williams accompanied Commander Kajzer. Corporal Sonny Oakley and Corporal Steve Metcalf arrived in another car. All wore casual uniforms. Commander Kajzer spoke with Mrs. Daron on the porch. Officer Williams was near, but not on, the porch; the other officers remained in the driveway, fifteen to twenty feet from the door. Commander Kajzer introduced himself, assured Mrs. Daron that she wasn't in trouble, and said the officers were there to speak with Mr. Sager. Mrs. Daron, who was unnerved by the officers' presence, said Mr. Sager lived in the basement, but was at work.

2

Commander Kajzer asked about computers, and Mrs. Daron said there were two in the house, one of which was located in the basement.

In response to Commander Kajzer's questions, Mrs. Daron said Mr. Sager paid no rent and had no lease, and that she bought the computer in the basement and let Mr. Sager use it. Commander Kajzer asked if the officers could look at the basement computer. Mrs. Daron asked several times if she had to let them, and each time Commander Kajzer said she didn't have to. Mrs. Daron never refused her consent, but was uncertain whether to allow the officers to see the computer. She didn't say it would be an invasion of Mr. Sager's privacy for her to allow the investigators to see the computer. Mrs. Daron went into the house occasionally during the conversation to check on an autistic child who was in her care that day.

After asking Commander Kajzer's permission, Mrs. Daron telephoned her husband. She went inside, then came back out with a cordless phone and told Commander Kajzer that her husband wanted to talk with him. Commander Kajzer told Mr. Daron that the officers were investigating Mr. Sager's internet activity. Mr. Daron said he wasn't getting involved and it was up to his wife whether they could check the computer.

Mrs. Daron asked what would happen if she didn't consent, and Commander Kajzer said the investigation would continue. Commander Kajzer didn't say Mr. Sager would be arrested, but Corporal Oakley (who is in charge of the sheriff's sex offender registry) said he could arrest Mr. Sager because Mr.

3

Sager hadn't updated his registration to report that he was employed. Corporal Oakley then added that they weren't there to make an arrest. Mrs. Daron consented to the officers inspecting the computer. Neither Commander Kajzer nor any of the county officers ever presented Mrs. Daron with a written consent-to-search form.

Access to the basement of the Daron house is through the rear of the house. Mrs. Daron led her visitors through a gate into a small fenced back yard to a back door that was closed, but not locked. The back door leads into a small entry way that leads to two more doors. One door, which was already open as Mrs. Daron led the officers that morning, leads to basement stairs directly ahead of anyone entering through that door. Slide bolts are located on each side of that door. The other door leads to the kitchen and the rest of the house. That door can be effectively locked from the inside by a hasp-type of lock, and was locked that morning. The door to the kitchen cannot be locked or unlocked from the entry way.

At the bottom of the stairs, the officers were shown into a series of rooms off to the right. No doors separate any of those rooms. Testimony at the suppression hearing indicated that a blanket ordinarily hung over the entrance to the rooms to keep out drafts, but on the July morning at issue, the blanket hung on a single nail in the wall. The visitors passed through the bedroom to a room where the computer sat on a desk.

4

We now know things the investigators didn't know on July 10. The Darons had allowed Mr. Sager to move into the basement earlier in the year because he needed a place to stay. No physical changes had been made to the basement, but Mrs. Daron had put in extensive work to change the area from a storage area to a living space. The basement still contained a furnace, a hot water heater, and a water softener, though the water softener may not have been working. The basement also contained a variety of furnishings and furniture, most of which belonged to Mr. Sager. Included among those furnishings were a refrigerator, a microwave oven, a toaster, and a coffee maker. Mr. Sager ordinarily ate his meals alone in the basement. The basement contained no bathroom. Mr. Sager had arranged for his own telephone line and internet access. The Darons tried to provide privacy to Mr. Sager. They rarely entered the basement unannounced. Indeed, they occasionally telephoned Mr. Sager from upstairs to invite him to dinner. Still, Mrs. Daron regularly went to the basement to clean Mr. Sager's living area and to collect his laundry, and Mr. Daron went to the basement to repair the air conditioner without checking with Mr. Sager. Mr. Sager was the only person to use the computer in the basement, but it belonged to Mrs. Daron. She had purchased it (along with a webcam), and Mr. Sager later told police officers that had he moved from the Adams Road residence, he would have left the computer behind.

After Mrs. Daron took the officers to the basement computer that July morning, Commander Kajzer "previewed" the hard drive, looking for child

5

pornography. The computer's Windows operating system wasn't password protected (though the America Online account was), so Commander Kajzer had no difficulty in working through the hard drive. Mrs. Daron stayed with the officers except on two occasions when she went upstairs to check on the child. She had to go outside and go around to the side door to gain entry to the main floor the first time, because the kitchen door was locked from the inside.

Mrs. Daron asked Commander Kajzer to show her what he had found on the computer. He showed her a nude photo of Mr. Sager and child pornography. Mrs. Daron became shocked and angry, expressing disbelief that Mr. Sager was doing that on the computer she had provided. She asked how Mr. Sager could get such images onto the computer, and the officers showed her the webcam. Mrs. Daron angrily grabbed the webcam and said she had bought that, too.

Commander Kajzer said he was going to confiscate the hard drive as evidence. Mrs. Daron asked when she would get the hard drive back, and asked Commander Kajzer if he could remove the pornographic images from the hard drive when it was returned. Commander Kajzer left his card with Mrs. Daron and asked her to have Mr. Sager contact him. Mr. Sager did so the next day. He eventually gave a statement to police. Mr. Sager was indicted on August 8 for knowingly transporting or shipping child pornography in interstate commerce, 18 U.S.C. § 2252A(a)(1), and knowingly possessing books, magazines, periodicals, films, videos, tapes or other matter containing child pornography which had been mailed, shipped or transported in interstate or foreign commerce by any means,

6

including by computer, 18 U.S.C. § 2252A(a)(5)(B). Mr. Sager has pleaded not guilty to both charges and moves to suppress all evidence obtained as a result of the search of his computer, including his statement to Commander Kajzer.

## II. LEGAL ANALYSIS

### A. CREDIBILITY ISSUES

The government and Mr. Sager disagree about the conversation leading up to the search. Mr. Sager says the investigators gave Mrs. Daron conflicting reasons about why they were there, that she refused to allow the computer inspection because it was an invasion of Mr. Sager's privacy (a characterization Mr. Sager says Mr. Daron echoed), that Commander Kajzer told her he would arrest Mr. Sager if she didn't let him inspect the computer, and that she escorted the police to the computer only after saying, "Well, I guess I don't have any choice then, do I?"

For several reasons, the court credits the testimony of Commander Kajzer and the sheriff's deputies over the testimony of Mr. and Mrs. Daron. Commander Kajzer, Corporal Williams, and Corporal Oakley were credible in their demeanor and testimony. Second, Mrs. Daron was in poorer emotional condition to serve as an accurate reporter of the morning's events, given her testimony about how nervous the visitors made her. For example, she testified that the officers arrived shortly after 8:00, a conclusion she reached by stating she had arisen at 7:45 that morning. Yet she was caring that day for an autistic child who ordinarily is

dropped off between 7:00 and 7:30 and whom, she testified, she never leaves unattended. Too, given Mrs. Daron's anger upon seeing the pornographic images on the computer she had provided to her brother, it seems likely that she would have been upset from the time of the visitors' arrival at her brother for bringing an investigation to her doorstep. To the extent anger mixed with nervousness, it seems unlikely that she would have served as the champion of Donald Sager's privacy rights.

Third, Mrs. Daron's testimony differed in important ways between the two days in which the suppression hearing was conducted, such as with respect to the purpose for which the blanket was hung at the bottom of the basement stairs. Her demeanor on the hearing's second day led the court to suspect she was trying to make her testimony more useful to her brother. Fourth, a fundamental illogic overlays Mrs. Daron's testimony: if she felt the computer inspection would invade her brother's privacy (as she says she told the officers), it's odd that she would telephone her husband rather than her brother. Everyone agrees she phoned David Daron that morning, and didn't phone Donald Sager.

The court can point to no fewer articulable reasons for crediting the officials' testimony over Mr. Daron's testimony. The court simply found the officers to be more credible. Mr. Daron testified that upon learning what the officers wanted to do, he said, "so you want to go downstairs and get in his computer, which is an invasion of privacy? That's a bunch of bullcrap," and Commander Kajzer immediately returned the phone to Carol Daron. If Mr. Daron's testimony is to be

8

believed, Commander Kajzer lied to Mrs. Daron when he returned the phone and told her (as everyone agrees he did) that Mr. Daron said the decision was up to her. If so, it seems improbable that Carol Daron wouldn't have confirmed that instruction when the phone was returned to her. Further, Mrs. Daron testified that "it's up to you" is exactly what she expected to hear from David Daron when she called him.

### B. VOLUNTARINESS OF THE CONSENT

Resolution of the credibility effectively disposes of Mr. Sager's claim that his sister's consent to the search was coerced. A search conducted without a warrant violates the Fourth Amendment unless the search falls within an exception to the warrant requirement. Katz v. United States, 389 U.S. 347, 357 (1967); United States v. DiModica, 468 F.3d 495, 499 (7th Cir. 2006). A warrantless search is constitutional under the Fourth Amendment if valid consent to search was given. United States v. Biggs, 491 F.3d 616, 622 (7th Cir. 2007).

Courts consider the totality of all of the surrounding circumstances in deciding whether a consent was voluntary. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). "The 'totality of the circumstances' analysis looks to factors such as 'age, education, and intelligence of the defendant; advisement of his rights; how long he was detained prior to the consent; repeated requests for consent; physical coercion; and whether he was in custody.'" United States v. Renken, 474 F.3d 984, 987 (7th Cir. 2007), citing United States v. LaGrone, 43 F.3d 332, 334 (7th

9

Cir.1994). The government bears the burden of proving that consent was properly given. United States v. Matlock, 415 U.S. 164, 171 (1974); Bumper v. North Carolina, 391 U.S. 543, 548 (1968).

Mrs. Daron is a mature woman with a high school education. Her demeanor, speech, vocabulary, and carriage while testifying at the suppression hearing demonstrate ample intelligence. That Commander Kajzer requested her consent more than once does not, standing alone, make the ensuing consent involuntary unless the requests themselves were coercive, *see* United States v. Johnson, 495 F.3d 536, 542 (7th Cir. 2007), and Commander Kajzer's requests were not coercive. His requests coincided with Mrs. Daron's questions, and so resulted in repeated statements to her that she was not required to give consent. Mrs. Daron wasn't detained before or after the consent: this was a conversation of some ten minutes on her side porch; she spoke to her husband during part of the conversation. There was no physical coercion.

Mrs. Daron was nervous, and doubtless was upset about the reasons for the visit, but her consent was voluntary.

## C. COMMON AUTHORITY

No matter how voluntary, Mrs. Daron's consent cannot be constitutionally effective if she had neither apparent nor actual authority to grant it. Mr. Sager argues that his control over the basement was sufficiently exclusive that Mrs. Daron could not consent to the search.

Arguably, this issue might not need to be reached under a different approach. It seems clear that Mr. Sager didn't view the computer as exclusively under his control: although passwords are required for America Online, neither the computer nor the operating system were password-protected, and Mr. Sager told Commander Kajzer that he would have left the computer behind had he moved out. If, in response to Commander Kajzer's request to see and preview the basement computer, Mrs. Daron had told her visitors to wait on the porch, then retrieved the computer from the basement and allowed Commander Kajzer to preview the hard drive in a room on the first floor, the preview would not seem to offend Mr. Sager's constitutional rights. That Mrs. Daron instead led the investigators into the basement would seem to be pertinent only if the government sought to make evidentiary use of something seen or seized from the basement. The court does not understand the government to have such information. Nonetheless, the government doesn't seek to defend the search on that theory, so the court addresses the parties' arguments.

A warrantless search may rest upon consent given by a third party who possesses common authority over the premises, with "common authority" springing from "mutual use of the property by persons generally having joint access or control for most purposes . . ." See United States v. Matlock, 415 U.S. at 171 n.7. The government has the burden of proving common authority, but need only prove either actual authority or apparent authority — authority investigators reasonably could believe the third person possessed at the time of

11

the purported consent. *See* Georgia v. Randolph, 547 U.S. 103, 109 (2006); Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); United States v. Basinski, 226 F.3d 829, 835 (7th Cir. 2000).

The court of appeals recently set forth a non-exhaustive list of factors courts should consider in deciding whether a consenting third party possessed common authority over the searched premises, United States v. Groves, 470 F.3d 311, 319 (7th Cir. 2006),[1] but those factors are of limited help in today's case. The question

---

[1]
>The relevant question for authority to consent under Matlock, then, is whether Foster had joint access or control of the apartment for most purposes, or whether she appeared to a reasonable officer to have joint access or control of the premises for most purposes. Facts that militate in favor of a finding of actual or apparent authority include but are not limited to: (1) possession of a key to the premises, (2) a person's admission that she lives at the residence in question, (3) possession of a driver's license listing the residence as the driver's legal address, (4) receiving mail and bills at that residence, (5) keeping clothing at the residence, (6) having one's children reside at that address, (7) keeping personal belongings such as a diary or a pet at that residence, (8) performing household chores at the home, (9) being on the lease for the premises and/or paying rent, and (10) being allowed into the home when the owner is not present. For the apparent authority analysis, the court must consider what the officers knew at the time they sought Foster's consent and whether those facts were sufficient to demonstrate that the officers reasonably, but erroneously, believed that Foster possessed shared authority as an occupant. Facts that came to light after the search began cannot reasonably have influenced the officers' beliefs regarding whether Foster possessed apparent authority.

United States v. Groves, 470 F.3d 311, 319 (7th Cir. 2006) (citations omitted) (cautioning that "This is certainly not an exhaustive list and we do not mean to suggest that district courts should use this as a checklist of factors in determining actual or apparent authority. Rather, it is offered to show the types of facts that should and could be considered in evaluating the issue of authority to consent to a search.").

12

concerning Mr. Sager isn't whether Mrs. Daron lived at the Adams Road residence — she not only said she lived at the Adams Road residence with her husband and Mr. Sager; she told the officers Mr. Sager only recently had come to live in the Daron's home. The investigation had disclosed two addresses for Mr. Sager, so that explanation was consistent with what the officers knew. Under those circumstances, there would be no reason to demand that Mrs. Daron show her driver's license, her mail, her bills, her clothes in the closets, her personal belongings (or diary or pet) on the premises. It was evident from her emergence from the house that Mrs. Daron had the authority to be in the residence when Mr. Sager was not present.

The officers knew at the time of their entry into the basement that Mrs. Daron lived in the home with her husband, and that the couple had welcomed Mr. Sager into the home. They knew Mr. Sager had signed no lease and paid no rent. A third party's lack of a key often defeats a claim of apparent authority over a locked area, *see, e.g.*, United States v. Jiminez, 419 F.3d 34, 40 (1st Cir. 2005); United States v. Brown, 328 F.3d 352, 356 (7th Cir. 2003); *but see* United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992), but Mrs. Daron had ready physical access to Mr. Sager's computer; no key was needed to access the top of the basement stairs from the rear entry way, and no doors impeded movement within the basement. The basement appeared to be a place in which a person slept, prepared food, and used the computer, but nothing about the basement's layout or appearance suggested exclusivity of use. The basement contained equipment

apparently providing heat, hot water, and soft water to the entire house. A password unknown to the third party may defeat a claim of apparent authority over the contents of a password-protected computer, *see, e.g.*, Trulock v. Freeh, 275 F.3d 391, 403 (4th Cir. 2001), but no password was needed to gain access to the pertinent images on the basement computer.

Third parties' apparent common authority has been found in less compelling factual scenarios. In United States v. Ladell, 127 F.3d 622 (7th Cir. 1997), it was found reasonable to assume that a parent had authority to consent to a full search of an apartment she shared with an apparently adult son, including what appears to have been the son's bedroom. The court of appeals explained that "[t]hird-party consents to search the property of another are based on a reduced expectation of privacy in the premises or things shared with another. . . . A third-party consent is also easier to sustain if the relationship between the parties — parent to child here, spouse to spouse in other cases — is especially close." 127 F.3d at 624. In United States v. Clutter, 914 F.2d 775, 778 (6th Cir. 1990), the appellate court upheld a finding that adolescent children who were often left at home alone had apparent authority to consent to the search of their parents' bedroom, to which they had access. "[T]he boys enjoyed that degree of access and control over the house that afforded them the right to permit inspection of any room in the house, and defendants assumed that risk." Id.

Everything that was apparent to the investigators on July 10 indicated that Mrs. Daron had common authority over the basement and the computer in the

14

basement. Nothing to the contrary was evident; nothing suggested a need for further inquiry before acting on Mrs. Daron's consent.

Facts that came to light later cloud the issue, but the court needn't decide whether those facts are such as to defeat a claim of actual authority. Apparent authority is sufficient for a legitimate consent to search, and Mrs. Daron had apparent authority to consent.

### III. CONCLUSION

For all the foregoing reasons, the court DENIES the defendant's motion to suppress (docket #22).

SO ORDERED.

ENTERED:     January 2, 2008


                                        /s/ Robert L. Miller, Jr.
                                        Chief Judge
                                        United States District Court